UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LAURIE DALLAS

                              Plaintiff,                           **VERIFIED COMPLAINT**
                                                                                      *Jury Trial Demanded*

  -against-


WYANDANCH UNION FREE SCHOOL
DISTRICT, WYANDANCH UNION FREE SCHOOL
DISTRICT BOARD OF EDUCATION, AND DR.
MARY JONES, Individually and in her Official Capacity,

                            Defendants.
-----------------------------------------------------------------X

Plaintiff, LAURIE DALLAS, by and through her attorneys, RAISER AND KENNIFF, respectfully alleges, upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

## **JURISDICTION AND VENUE**

1. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

2. Venue is proper in this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events which give rise to Plaintiff's claims took place in Suffolk County, New York, which is located in the Eastern District of New York.

3. All conditions precedent to filing suit have been fulfilled. On or about November 12, 2018, Plaintiff filed a notice of claim against the Defendants.

## **PARTIES**

4. Plaintiff LAURIE DALLAS is a 51-year old resident and domiciliary of Suffolk County, New York. At all times relevant, Plaintiff was an "employee" of Defendants as that term is defined by the Title VII of the Civil Rights Act of 1964 ("Title VII").

5. Defendant WYANDANCH UNION FREE SCHOOL DISTRICT (the "District") is a public school district organized and existing under the laws of the State of New York. Its administrative office is located at 1445 Dr. Martin Luther King, Jr. Boulevard, Wyandanch, New York 11798. At all times relevant to this complaint, Defendant District was Plaintiff's "employer," as that term is defined by Title VII.

6. Defendant WYANDANCH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION (the "Board") is a municipal corporation organized and existing under the laws of the State of New York. Its administrative office is located at 1445 Dr. Martin Luther King, Jr. Boulevard, Wyandanch, New York 11798. At all times relevant to this complaint, Defendant Board was Plaintiff's "employer," as that term is defined by Title VII.

7. Defendant DR. MARY JONES is the Superintendent of Schools at Wyandanch Memorial High School. Its administrative office is located at 1445 Dr. Martin Luther King Jr. Boulevard, Wyandanch, New York 11798. As an individual Defendant, Jones had control over the terms and conditions of Plaintiff's employment at the District. At all times relevant to this complaint, Defendant Jones was Plaintiff's "employer," as that term is defined by Title VII.

## FACTUAL ALLEGATIONS

8. Plaintiff Laurie Dallas is a 51-year-old female, employed by the Wyandanch Union Free School District since June 2011, as the sole District Accountant.

9. In June of 2014, the payroll person was arrested for a DUI and was placed on leave by Dr. Jones. Plaintiff, being the payroll backup person, had never done the district's payroll before and taught herself very quickly to get the next payroll done in time. Plaintiff put in extra hours and stayed particularly late the night before payday to ensure the checks were ready to distribute first thing in the morning, as was normal procedure.

10. The next morning, without even speaking to the Plaintiff, Dr. Jones sent out a district-wide email that the paychecks weren't ready and could be picked up after 3:00, at the end of the school day. Some individuals had already come to the office and picked up their paychecks prior to the email.

11. Soon the word was out and the Plaintiff was receiving many phone calls from angry employees, wanting to know why the payroll wasn't done on time and why some people had been able to collect their checks. The Plaintiff told employees that it was completed on time and ready to go and wasn't sure why Dr. Jones had sent out the email.

12. Soon after, the Plaintiff received a phone call from Dr. Jones who screamed at the Plaintiff, "why did you let people know the checks were ready!?", to which the Plaintiff replied, "because they were". Later that day, she asked Plaintiff to bring Dr. Larry McCord's payroll check to her, rather than distribute it with the others. Plaintiff later came to find out that Dr. McCord had filed a case against Dr. Jones.

13. The next incident the Plaintiff experienced with Dr. Jones was right after the huge snow storm that hit Long Island in 2015. Dr. Jones called the Plaintiff and asked her to come to her office and to bring her union rep.

14. In shock and never having experienced a disciplinary meeting, the Plaintiff waited for her WASA union rep, Sharin Wilson to join her. Also in the meeting were the Plaintiff's new boss, Bob Howard, the Assistant Superintendent for Business and the Assistant Superintendent of Human Resources, Kester Hodge.

15. In front of each of them was a single piece of paper. This was an anonymous letter claiming that the Plaintiff had called the Superintendent disparaging names and accusing the Plaintiff of being "border-line racist". Accusations were being thrown at the Plaintiff, which she denied, but she did admit that she was not happy with the superintendent when she saw Jones leaving early the day of the snowstorm and not letting her staff also get a safe, early start. As Dr. Jones was leaving, the Plaintiff spotted her and said, "get home safe".

16. By the time the accusations got to "borderline racist", Plaintiff got so upset that she stood up and stated she would not sit and listen to anyone call her racist or allow any more merit to be given to this anonymous letter. The meeting then abruptly ended. The letter, to this day, has never been put into the Plaintiff's employee file. Upon information and belief, Dr. Jones, herself, had written the letter.

17. A copy of the letter was never given to the Plaintiff. Mr. Howard and Mr. Hodge both told the Plaintiff that, they too, were broadsided by the meeting and had been given no heads up as to what it would be about, both feeling that the accusations were baseless.

18. The Plaintiff, along with Mr. Howard and the District Treasurer would attend monthly Suffolk Association of School Business Officials (SASBO) meetings that would be held as either breakfasts or luncheons in various Suffolk County restaurants. Dr. Jones learned that Mr. Howard was bringing the Plaintiff to the Holiday SASBO luncheon and called him very late at night, at home, to direct him not to bring Plaintiff to the luncheon or to any others in the future. A reason was never provided.

19. When Plaintiff was offered and brought a district-issued laptop on her vacation in case there was an unexpected work issue, Dr. Jones sent emails to Mr. Howard stating that district security had been breached due to this. No matter how many times Mr. Howard explained that he had approved this, and that this had been done before by many of his employees and that the access was only that which the Plaintiff had in-district, Jones still continued to accuse Plaintiff of committing a "breach of security". Upon information and belief, Jones had never before and never since, accused either of the two Black business office employees of the same breach of security when they took district-issued laptops home.

20. When Plaintiff passed the Senior Accountant Civil Service exam with a high grade of 90, she was told confidentially that Dr. Jones said she would never get that promotion while she was there. She also inquired about a "Accountant Stipend" that her Black predecessor used to receive and was told she was not eligible for the stipend. Plaintiff asked Ms. Wilson to present a consideration during contract negotiations. Mr. Howard questioned why the Accountant position, that requires a college degree, was included on the same salary line as non-degree requiring positions.

21. It was widely known that Dr. Jones did not like Mr. Howard and referred to him as "that white guy" in the company of other administrators. She admonished him for hiring "too many whites" and said at one Board meeting that from now on the district would "no longer hire white people, only our own kind from now on". At one Superintendent's Conference Day, she asked all to stand to recite the "Black" Pledge of Allegiance and then laughed when she realized what she said.

22. In October of 2017, the Board of Education, hired an outside independent investigator to conduct an investigation into claims filed against Jones. Plaintiff and others were mandated to participate in this investigation and were assured their interview answers would be secure and confidential. Someone on the Board handed the final transcript of the investigation directly to Dr. Jones and that's when the retaliation began. When Plaintiff became aware that the transcript was given to Dr. Jones, she immediately wrote an email to the entire BOE expressing her dismay of the breach of confidentiality and said if any retaliation was taken against her, she would seek legal representation. It didn't take long.

23. On December 14, 2017, Plaintiff was told by Mr. Hodge, that Dr. Jones was demanding that the Plaintiff be moved out of the building and into the Special Ed Department in the High School. She had been insisting on it daily and Mr. Hodge explained to her that there were Civil Service rules he had to look into and that the District Accountant really needed to work in the Business Office. Hodge also pointed out that that Karen Parrish, an account clerk typist within the district, worked in Special Ed and that she had been moved there to keep her from working in the same building as that of Plaintiff and Beverly Koch. As discussed *infra* Parrish had prior accused Plaintiff of "grabbing her

crotch in the hallway at every opportunity." Upon information and belief, Parrish made similar complaints about another employee of the district at the same time. Parrish went on to threaten Plaintiff physically and was remanded to psychiatric evaluations and upon her return was assigned to work in the special ed department to keep her away from Plaintiff.

24. During November and December of 2017, the Plaintiff was directed to do the payroll while the payroll clerk position was in transition. The payroll clerk was reassigned to the Special Ed office at the High School. The Plaintiff was the sole payroll backup and proceeds to do both full-time positions for those months (District Accountant and Payroll Clerk). The Plaintiff put in additional hours and then brought her timesheet to Mr. Howard to approve. Mr. Howard stated that he could not approve it because he had been directed by Dr. Jones to not approve any overtime, but understanding the extra hours were required to get both jobs done, he in turn, brought it to Dr. Jones to approve.

25. After not hearing back, the Plaintiff called Dr. Jones' assistant Margaret, who in turn, called Dr. Jones. Plaintiff was then told by the assistant that Dr. Jones said she is not approving it and" to take it up with your union". The union rep, Ms. Wilson, tried to have it approved over the next few weeks by Dr. Jones, to no avail. Dr. Jones stated saying it was not pre-approved. As if the being directed to do the full-time position of payroll in addition to the Plaintiff's full-time position of Accountant would not result in overtime. Plaintiff asked both Ms. Wilson and Ms. Tammy Mays to file a grievance on her behalf. Plaintiff's union contract provided overtime pay for overtime hours and also has no mention of prior approval being necessary. Then payroll would need to be done during the Winter Break and this would result in overtime. Mr. Howard decided he will make

7

sure he does this by the book, so the denials could not happen again to the Plaintiff. He asked Dr. Jones' permission to have the Plaintiff come in over the break in order to have payroll ready in time. She flat out denied the request and instead gave the opportunity for overtime to a black, non-union, substitute clerk who had done payroll for the district in the past. Under the union contract, this is not allowable. The person given overtime was never approved by the board to receive overtime. Upon information and Belief, Jones falsified documents to get this employee paid.

26. Dr. Jones' retaliation against Mr. Howard followed shortly in January of 2018, when Mr. Howard came up for tenure. Not only did Dr. Jones not grant him tenure, but she gave him a 30-day termination letter. The BOE granted Mr. Howard a one-year extension, but eventually Mr. Howard ended up leaving the district on his own volition after all the negativity and trouble he had endured at Dr. Jones' hand. His leadership over the Business Office had been usurped by Dr. Jones. Access to security camera footage was taken away from him after he reported an incident he viewed. Dr. Jones refused to give him access to the mileage on the odometer on her district-issued vehicle in order for him to include it on her W-2 form for taxation.

27. Mr. Howard discovered acts of theft by Dr. Jones and reported them to the BOE. There were serious issues that he discovered in the payroll function regarding IRS wage garnishments, inappropriate changes in tax exemptions, changes being made to payroll after the register had been approved, employee loans not being correctly deducted and many more. He gave the payroll employee a review that reflected these issues and was directed by Dr. Jones to tear it up. He was then immediately told to instead write the Plaintiff up on an error that she had made and brought to his attention, which he refused

to do. Plaintiff believes there was collusion between the Superintendent, the Director of IT, Sharin Wilson (also the WASA union Rep) and the payroll person to hide an IRS garnishment for Ms. Wilson that was hand-delivered to the payroll person by an IRS agent and ordered to be deducted immediately. The garnishment was not entered and was only brought to the Plaintiff's attention by the IRS Agent's call weeks later, demanding to know why it was ignored and telling her that a hefty fine could be levied against the district. When Mr. Howard went to look into this, Ms. Wilson's garnishment folder mysteriously went missing.

28. It was Mr. Howard who realized that the Wyandanch Public Library wasn't being charged interest on the annual loan they received from the district. He then discovered that the district had been unknowingly paying the Employee Retirement System for the library employees as well. When the Plaintiff was directed to issue invoices to the library for the interest and for their portion of the ERS payments, things really began to get heated, because Nancy Holliday, a library board member, who also sat on the BOE and was also the District's Audit Committee Chairperson, did not agree with being charged for the ERS and would not pay for it. Mr. Howard and the Plaintiff made state auditors and the external auditors aware of all of the above. In the end, nothing came of the BOE's independent investigation, other than all the acts of retaliation which Dr. Jones perpetrated against Mr. Howard and the Plaintiff. To date, the Library has not paid their bills to the district.

29. Upon information and belief, the entire investigation by an "independent" investigator Jody Benjamin was just a facade to make it look as though the BOE was seriously

looking into claims filed against Dr. Jones. The "independent" investigator was a former employee of the district's law firm.

30. In April of 2018, the district finally paid the Plaintiff the overtime she worked in November and December of 2017, but not without first having someone check the camera footage of the dates to verify the times. This extra step was not taken in other overtime requests. When the Black payroll person, Michelle Walthall put in for overtime, her timesheet was immediately signed by Dr. Jones, no questions asked.

31. On September 17, 2018, the new Business Manager, Idowu Ogundipe, held a staff meeting that Dr. Jones walked into in the middle of his agenda. She held in her hand some library paperwork and raised the first invoice and asked loudly, "who sent this invoice?!". Plaintiff immediately replied it was her and asked if there was a problem. Dr. Jones then turned to Mr. Ogundipe and asked, "did you know about this invoice?!"

32. Being new, Mr. Ogundipe, who had been included in the conversation about the preparation of the invoice, said he wasn't sure, but didn't think so. The District Treasurer quickly reminded him that he had been involved in the discussion. Dr. Jones went on to chastise the Plaintiff in front of the entire Business Office staff, stating that she "had better get her numbers right, because she can't be sending one invoice with one amount and then the next week sending another with a different amount!". The Plaintiff calmly explained that this invoice was for the school year 17/18, whereas the first one was for 16/17 and that this invoice was not to revise the first but was to be added in addition to the other. Plaintiff also mentioned that the external auditors of RS Abrams, had directed that invoices for an additional two more years retroactively should be sent and that they were including an average of the two known figures to the deferred revenue on the

financial statements. No one chose to address that knowledge and, to date, no additional invoices have been sent.

33. The very next day, September 18th, Plaintiff and Beverly Koch became aware that Karen Parrish was working in the administration building. In March of 2016, Ms. Parrish had complained to the WASA union rep, Sharin Wilson about harassment she was allegedly enduring. The allegations were so odd and unbelievable that Ms.Wilson reached out to Mr. Hodge in HR immediately. Soon after, the Plaintiff and Ms. Koch were separately called in to a meeting with Mr. Hodge and Ms. Wilson to be informed of the seriousness of the situation. Ms. Parrish informed Ms. Wilson that somebody was attacking her from behind on multiple occasions and had scratched her eye on the last attack. When Ms. Wilson asked her if she saw her attacker, Ms. Parrish replied, "well, no, but it has to be Beverly, she's the only other person in the office".

34. Sensing that something seemed odd about the accusation, Ms. Wilson went on to ask Ms. Parrish if there was anyone else who was bothering her, to which she replied, "yes, Laurie Dallas grabs my crotch in the hallway at every opportunity". The Plaintiff and Ms. Koch were then told that Ms. Parrish had made a very disconcerting and threatening statement. She had said, "if I had done what I wanted to do to them, they would have needed an ambulance on Friday". Mr. Hodge and Ms. Wilson told the Plaintiff and Ms. Koch that Ms. Parrish would be sent for a pysch evaluation and that they were taking the situation very seriously and doing everything to ensure their safety, but that it was their responsibility to make them aware of any threat. They were directed to not speak to anyone about the situation to protect Ms. Parrish's privacy. Ms. Parrish was out on paid leave for a few weeks or so and then given a doctor's approval to return to work. The

11

Plaintiff and Ms. Koch were informed that as an additional measure of safety, Ms. Parrish was being reassigned to the Special Ed office in the High School so that they would not have to work with in the same building with her. Both the Plaintiff and Ms. Koch were satisfied with the steps the district had taken and the resolution of the situation. Because of this, neither had procured a restraining order against Ms. Parrish as originally planned.

35. When the Plaintiff and Ms. Koch saw Ms. Parrish working in the building they were upset and concerned. They immediately met with Mr. Hodge to ask what was going on. He says that he was just as surprised to see her there this morning as they were, because the suggestion had come up that she would be reassigned as an assistant spilt between Ms. Wilson and another administrator and he reminded Dr. Jones that Ms. Parrish had been moved out of the admin building for the Plaintiff and Ms. Koch's safety. As per his request, both then sent emails to he and Sharin Wilson, the WASA union rep reiterating their concerns.

36. On Thursday, September 20th, Mr. Hodge sent each a letter that a meeting would be held on Friday to voice their concerns. The next day the meeting included the Plaintiff, Beverly Koch, Mr. Hodge, Mr. Ogundipe and Dr. Jones. Sharin Wilson, the union rep, could not make it. Plaintiff and Ms. Koch offered to have Ms. Ann Archer, the Human Resources clerk and Union Rep, join the meeting in Ms. Wilson's place as union representation. Plaintiff and Ms. Koch decide they would rather just be each other's representation and not involve anyone else in the meeting out of respect for Ms. Parrish's privacy.

37. No one said anything and then Mr. Hodge, trying to start the conversation, said, "ok, this meeting was called so that Laurie and Beverly could voice their concerns about Karen

working here at admin". The Plaintiff responded, "no, our concerns are well-documented. We are here to find out why our safety is suddenly again at risk and why no one even had the decency to give either of us a heads up or explanation". Dr. Jones states that "due to budgetary concerns, Karen will now be working here and if you have a problem with that, you are more than welcome to transfer to another building".

38. The Plaintiff and Ms. Koch were shocked at the statement as it showed a complete disregard for two employees' safety with a serious documented issue that the district made them aware of in the first place. After some conversation back and forth, their concerns were dismissed as frivolous and they were once again told they could be transferred voluntarily to any other building if they don't like it, because Ms. Parrish's skills were "required here". Plaintiff asked why Ms. Parrish's Clerk Typist skills were more required for the district than the combined skills of the District Accountant and the Business Office Sr. Clerk Typist of 21 years. Upon this summary question, the Plaintiff was told by Dr. Jones to "not to put words in her mouth".

39. This "reassignment or transfer" of the District Accountant on October 1, 2018 resulted in a demotion, since the Plaintiff was longer doing accounting work, but instead, clerical duties. Dr. Jones then proceeded to question Plaintiff and Ms. Koch about whether they had have faith in the district's security measures, to which they both replied 'no'. Ms. Koch pointed out that the district did not have a head of security, that anyone comes and goes through the building and that the cameras and metal detector (at the high school) were not even functioning. She also brought two articles of workplace shootings that had just appeared in the previous day's paper. Dr. Jones callously told Plaintiff "you can get shot anywhere, even in Church, and you just have to pray that the person next to you has

13

a gun". Not knowing what to even reply to this example, Plaintiff pointed out that the district security guards do not carry guns. Again Dr. Jones said "if you don't like it, transfer".

40. Plaintiff then asked "Dr Jones if you were being threatened would this employee be working in the building?" to which Jones stated "I'm threatened all of the time.

41. Plaintiff then asked Mr. Hodge how many days are customary for the decision to be rendered and he said usually five days. The Plaintiff was ensured that meant five business days as it was Friday and they would not be able to reach their union over the weekend. It was agreed that, yes, they had five business days to tell the district whether they would transfer to another building or take their chances and work with Ms. Parrish in the same building. On Tuesday, September 25, 2018 a district security guard, hand-delivered a district letter to Plaintiff's home at 8:00 PM, which Plaintiff's husband signed for. The letter read, "please be advised that because you have not responded to my letter sent to you this morning by email and hand-delivered, as of close of business today, Tuesday, September 25, 2018, you are hereby being transferred involuntarily as per Article XVI of the WASA contract, to the office of Special Education."

42. On Wednesday, upon asking the Superintendent's assistant and the district messenger, she was handed a copy of the first letter which Plaintiff never received. The district messenger gave a description of a house on the corner, he supposedly delivered the letter to and left in the mailbox that did not fit the description of the Plaintiff's house. Plaintiff called her neighbor, Ann Romano, who lives next door to the Plaintiff in the house on the corner, to have her check her mailbox where no letter had been delivered. On Monday, October 1, 2018, Plaintiff called out sick and went to her doctor to get something

14

prescribed for her work-related stress and lack of sleep and was prescribed Travazone. Upon information and belief, the first letter Plaintiff was handed was never actually delivered to her, nor was any attempt made.

43. Plaintiff reported to Special Education Department on October 2nd and was trained by Trace Francis, a Sr. Account Clerk Typist, who switched positions with the Plaintiff. Both heads of departments were upset about the "reassignments" and asked Dr. Jones to reconsider with no avail.

44. On Tuesday, October 2, 2018, Plaintiff spoke to Ryan Blake at Suffolk County Civil Service about the "reassignment". He told Plaintiff that the district had been very busy redefining her position of accountant so that it no longer required an accountant. When she asked how they could do that and get away with it, she was told the district's plan regarding any responsibilities that might require an accountant, would be performed by an outside party.

45. During the second two weeks of October, Plaintiff was directed to report to the Special Ed office in the morning, then go to the Business office to train Ms. Francis in the afternoon, and then when Ms. Francis left at 3:30, to return to Special Ed office until 5:00. The last week of October saw Plaintiff and Ms. Francis calling each other constantly trying to teach each other their respective positions. They were both unnecessarily stressed and exhausted. Ms. Koch herself had not been at work since Ms. Parrish's return and may not even be aware of her reassignment to the LFH Annex building.

46. Plaintiff is hearing-impaired and wears two hearing devices. Her new position in the High School has her seated in close contact to the speaker, with constant announcements

15

throughout the day and daily changing of period bells. She has already not known an intruder drill alarm was happening until all lights were shut off and her boss told her to end a phone call, because she was trying to hear a vendor so desperately over the alarm bells going off. On Friday, October 26, 2018, fire alarm bells rang for fifteen minutes to announce a Breast Cancer Walk that was about to begin. Plaintiff has difficulty hearing on the telephone normally and is now responsible for answering phones all day long in conjunction with all of this extraneous noise.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION
*Discrimination and Retaliation in Violation of 42 U.S.C. § 1981*

47. Plaintiff repeats and realleges the allegations as if fully stated herein.

48. Section 1981 states as follows: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

49. The section further states that: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

50. Defendant's discrimination against Plaintiff is in violation of her rights as afforded to her by the Civil Rights Act of 1866, 42 U.S.C. 1981.

51. By the conduct described *supra*, Defendant intentionally deprived Plaintiff, an person of Caucasian origin that same rights as are enjoyed by other citizens.

52. As a result of Defendant's discrimination in violation of Section 1981, Plaintiff has been subjected to disparate treatment on the basis of her race and national origin and has been unlawfully discriminated against in the terms and conditions of his employment on the basis of her race and national origin in violation of 42 U.S.C. § 1981.

### AS AND FOR A SECOND CAUSE OF ACTION
*Discrimination and Retaliation in Violation of New York Executive Law § 296*

53. Plaintiff repeats and realleges the allegations as if fully stated herein.

54. New York State Executive Law § 296 provides that: "1. It shall be an unlawful discriminatory practice: '(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges or employment.'"

55. Defendant engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her race and national origin.

56. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

57. Defendant engaged in unlawful discriminatory practice by wrongfully retaliating against Plaintiff.

58. By way of the foregoing, Defendants in unilaterally changing the terms and conditions of Plaintiff's employment following her complaints of corruption against the District; Defendants retaliated against Plaintiff for her lawful participation in investigations against them in violation of Title VII of the Civil Rights Act of 1964 and the First Amendment of the United States Constitution pursuant to 42 U.S.C. 1983. Defendants repeatedly expressed the desire that Plaintiff should resign by moving Plaintiff's job and making her essentially unable to complete her job duties violated the aforementioned laws and the First Amendment and caused Plaintiff to be constructively discharged.

### AS AND FOR A THIRD CAUSE OF ACTION
*(Equal Protection)*

59. Plaintiff repeats and realleges the allegations as if fully stated herein.

60. Based upon the foregoing, the actions and mistreatment of Plaintiff by all Defendants violate the Equal Protection Clause to the 14th Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1981 and 42 U.S.C.§1983, because such acts were taken in accordance with Defendants" custom or practice of discriminating and/or selectively treating individuals. These practices were so persistent and widespread that they constitute constructive acquiescence of the policymakers in violation of 42 U.S.C.§1983.

### AS AND FOR THE FOURTH CAUSE OF ACTION

*Violation of the First Amendment
Right to Free Speech Pursuant to 42. U.S.C. § 1983*

61. Plaintiff repeats and re-alleges each and every allegation contained herein.

62. By reason of the foregoing, Defendants have unlawfully discriminated and retaliated against Plaintiff as concerns her terms, conditions and privileges of employment, in

that Defendants created a hostile work environment, subjected Plaintiff to an atmosphere of adverse acts, and treated her disparately because Plaintiff spoke on matters of public concerns about Jones' mismanagement and misappropriation of District funds. These acts by Defendants are in violation of Plaintiff's rights to free speech as guaranteed under the First Amendment to the United States Constitution.

63. As a direct result of the Defendants' violation of Plaintiff's First Amendment rights to freedom of speech, as alleged herein above, Plaintiff has suffered damages, which are set forth more fully below

### AS AND FOR A FIFTH CAUSE OF ACTION
*Negligent Hiring and Supervision*

64. Plaintiffs repeat and reallege all of the aforementioned.

65. Defendants owe a duty to exercise reasonable care in training, and supervising their employees and agents.

66. Defendants failed to take all reasonable steps to reduce risk of injury and harm to Plaintiffs, by refusing to discipline Dr. Jones and allowing her negligent conduct to continue unabated.

67. Based on the foregoing, Defendants breached their duties to Plaintiff, and as a result of their material breach, proximately caused Plaintiff significant emotional damages which were reasonably foreseeable.

68. As such, Defendants are liable for negligence, under New York State common law.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants for all compensatory, emotional, psychological and punitive damages, lost compensation, front pay, back pay, liquidated damage, injunctive relief, and any other damages permitted by law pursuant

to the above-referenced causes of action. It is respectfully requested that the Court grant the Plaintiff any other relief to which she is entitled, including but not limited to:

1. Awarding reasonable attorneys fees and the costs and disbursements of this action;

2. Granting such other and further relief that to the Court seems just and proper.

**Further,** Plaintiff demands a trial by jury.

Dated: Garden City, New York
May 30, 2019

    RAISER & KENNIFF
    *Attorneys for Plaintiff*
    300 Old Country Road Suite 351
    Mineola NY 11501

    _____
    Jonathan A. Tand